ENTERED FEB 1 2 2015 *append.*

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
RE-11-77
*TDW-CUM-01-29-15*

WELLS FARGO BANK, N.A.,
As Trustee,

      Plaintiff

v.

ORDER

BRADFORD WHITE, et al.,

      Defendant

**STATE OF MAINE**
**Cumberland. ss. Clerk's Office**

**JAN 3 0 2015**

**RECEIVED**

Before the court is defendant Brad White's motion for attorneys fees pursuant to 14 M.R.S. § 6101 (2014). After protracted litigation and at least one lengthy delay resulting from White's health problems, White ultimately prevailed in defending the foreclosure action brought by plaintiff Wells Fargo Bank.

The statute under which White seeks fees, 14 M.R.S. § 6101, provides in pertinent part as follows:

> If the mortgagee does not prevail, or upon evidence that the action was not brought in good faith, the court may order the mortgagee to pay the mortgagor's reasonable court costs and attorney's fees incurred in defending against the foreclosure or any proceeding within the foreclosure action and deny in full or in part the award of attorney's fees and costs to the mortgagee.

Wells Fargo argues that this mortgage foreclosure action was commenced on January 13, 2011 and that the statutory language under which White is seeking fees was added as an amendment to 14 M.R.S. § 6101 by P.L. 2011, ch. 269 § 1. That amendment was effective on

September 28, 2011 – eight months after the complaint was filed.[1] The prior version of the statute, which was in effect when the foreclosure action was filed, made no provision for a statutory attorney's fee award to the mortgagor but provided only for the award of attorney's fees to a prevailing mortgagee.

The application of statutory amendments to pending proceedings is governed by 1 M.R.S. § 302, which provides that "actions and proceedings pending at the time of the passage, amendment or repeal of an Act or ordinance are not affected thereby." The Law Court has ruled that absent express language demonstrating that the Legislature intended that an amendment have retroactive effect, amendments are treated as prospective and do not apply to pending proceedings pursuant to 1 M.R.S. § 302. *See Bank of Maine N.A. v. Weisberger*, 477 A.2d 741, 745-46 (Me. 1984).

Notably, the *Weisberger* case involved a claim for attorneys fees by a <u>mortgagee</u> under 14 M.R.S. § 6101. The Law Court held that because the action had been commenced in January 1981 and the statutory provision allowing attorneys fees to a mortgagee did not become effective until September 1981, the Bank was not entitled to attorneys fees when it ultimately prevailed with the entry of a judgment entered in 1984.

There is no express language in P.L. 2011 ch. 269 denoting legislative intent that the amendment allowing the award of attorney's fees to mortgagors was to have retroactive effect. Accordingly White is not entitled to pursue a claim for fees under 14 M.R.S. § 6101, as amended by P.L. 2011 ch. 269 § 1.

---

[1] Under Me. Const. Art. IV, Pt. 3, § 16, acts of the Legislature become effective 90 days after the recess of the legislative session in which the act was passed unless the preamble to the act includes an emergency clause. P.L. 2011 ch. 269 § 1 does not contain any emergency clause.

2

The entry shall be:

Defendant's motion for attorneys fees is denied. The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: January __29__, 2015

Thomas D. Warren
Justice, Superior Court

CLERK OF COURTS
Cumberland County
205 Newbury Street, Ground Floor
Portland, ME 04101

JOHN CAMPBELL ESQ
59 BAXTER BOULEVARD
PORTLAND ME 04101

Defendant's Attorney

CLERK OF COURTS
Cumberland County
205 Newbury Street, Ground Floor
Portland, ME 04101

WILLIAM JORDAN ESQ
SHAPIRO & MORLEY LLC
707 SABLE OAKS DRIVE SUITE 250
SOUTH PORTLAND ME 04106

Plaintiff's Attorney

ENTERED SEP 2 3 2014 *append*

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
RE-11-77
*CUM-TDW-09-08-14*

WELLS FARGO BANK, N.A.,
As Trustee,

      Plaintiff

    v.

BRADFORD WHITE, et al.,

      Defendant

ORDER

STATE OF MAINE
Cumberland ss. Clerk's Office

SEP 08 2014

RECEIVED

In light of the Law Court's decision in <u>Bank of America v. Greenleaf</u>, 2014 ME 89, the court will grant defendant's motion for reconsideration and will enter judgment for defendant on the ground that the notice of default and right to cure letter sent to White on November 17, 2010 (Plaintiff's Ex. 6) did not comply with 14 M.R.S. § 6111 as interpreted in <u>Greenleaf</u>. 2014 ME 89 ¶¶ 29-31.

In addition, the court observes that there is some difficulty in upholding a foreclosure based on terms which are not contained in the mortgage but which were retroactively established by the court when it limited the application of certain terms of the mortgage to avoid an unconscionable result.

The entry shall be:

Defendant's motion for reconsideration is granted and judgment will be entered for defendant on the ground that the notice of default and right to cure letter sent to White on November 17, 2010 did not comply with 14 M.R.S. § 6111. The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: September _05_, 2014

Thomas D. Warren
Justice, Superior Court

CLERK OF COURTS
Cumberland County
205 Newbury Street, Ground Floor
Portland, ME 04101

JOHN CAMPBELL ESQ   *Defendants Attorney*
CAMPBELL & ASSOCIATES
59 BAXTER BOULEVARD
PORTLAND ME 04101

---

CLERK OF COURTS
Cumberland County
205 Newbury Street, Ground Floor
Portland, ME 04101

WILLIAM JORDAN ESQ   *Plaintiffs Attorney*
SHAPIRO & MORLEY LLC
707 SABLE OAKS DRIVE SUITE 250
SOUTH PORTLAND ME 04106

STATE OF MAINE                          SUPERIOR COURT
CUMBERLAND, ss.                         CIVIL ACTION
                                        RE-11-77
                                        TDW—CUM—3/21/2014

WELLS FARGO BANK, N.A.,
As Trustee,

            Plaintiff

    v.                                  ORDER

BRADFORD WHITE, et al.,

            Defendant


A non-jury trial was held in the above-captioned mortgage foreclosure action on May 31, 2013 and December 12, 2013.[1] Most of the six and one half month interval between the days of trial resulted from a serious medical condition that defendant White experienced which affected scheduling of the second day of trial. The court finds as follows:

1.      Ownership of Note

Wells Fargo produced the original note at trial.[2] Although White questioned whether he signed the note that was offered at trial, the court – based on White's previous deposition testimony – concludes that defendant White did sign the note produced at trial.

The original note is made payable to Option One Mortgage Corporation. Accompanying the three-page note is an undated one page allonge constituting an endorsement in blank. The note and allonge are contained in a folder, attached by a two prong metal fastener. They are the

---

[1] This is the second mortgage foreclosure case that Wells Fargo has commenced against White. By agreement a prior case was dismissed without prejudice in October 2010. Wells Fargo Bank N.A. v. White, PORDC-RE-2008-27. In that case both Wells Fargo and White were represented by the same counsel who represent them in this action..

[2] Because issues have been raised with respect to the original note, the court has retained that note pending final judgment and the conclusion of any appeals. It has been held in a safe in the clerk's office. A copy of the note has also been included with the exhibits.

only items in the folder. The pages of the note and the allonge are attached together by the metal fastener of the folder. The allonge refers to Bradford White and refers to the same property address, loan amount, and loan numbers as the note. The court finds that the allonge is sufficiently affixed to the note.

White argues that the allonge had to have been affixed to the note when the note was delivered to Wells Fargo. However, the court can find no legal requirement an allonge cannot be affixed at a later time. 11 M.R.S. § 3-1201(2) provides that negotiation of a note "requires transfer of possession of the instrument <u>and</u> its indorsement by the holder" (emphasis added). That section does not require that the indorsement occur at the time of transfer, and 11 M.R.S. § 3-1203(3) specifically contemplates the possibility that an indorsement can occur after the transfer. The court finds that the allonge constitutes proof of an endorsement of the note and that Wells Fargo, as the current holder of the original note, is entitled to bring a foreclosure action.

Finally, to the extent that White is now challenging the authenticity of the endorsement signature on the allonge, 11 M.R.S. § 3-1308(1) provides that authenticity is admitted unless specifically denied in the pleadings. White's answer does not specifically deny the validity of the signature on the allonge.

2.   Trust Ownership

Wells Fargo brought this action "as trustee of Carrington Mortgage Loan Trust Series 2006-OPT 1, Asset Backed Pass – Through Certificates, Series 2006-OPT 1." Wells Fargo has adequately proven that the Pooling and Servicing Agreement is a business record and that Brad White's loan has been placed in the trust. The closing date of the trust was March 14, 2006 and the mortgage was not assigned to Wells Fargo until January 15, 2008, but the court sees no legal

2

reason why a mortgage cannot be belatedly assigned where this action to enforce the mortgage was commenced after the assignment.

### 3. Assignments of Mortgage

White does not dispute that he signed the mortgage, which has been filed in the Registry. Wells Fargo offered evidence that the mortgage originally granted to Option One had been assigned to Wells Fargo as Trustee. Two assignments were admitted in evidence, the first an assignment from Option One dated January 15, 2008 and the second a "confirmatory assignment" dated December 3, 2010, from "Sand Canyon f/k/a Option One Mortgage."[3] Both of these documents were recorded in the Registry of Deeds and are therefore admissible pursuant to M.R.Evid. 803(14).

The notice of default relied on by Wells Fargo was sent on November 17, 2010 – approximately two weeks before the confirmatory assignment. However, the court finds that the first assignment is adequate evidence that Wells Fargo is the holder of the mortgage.

### 4. Notice of Default

On the second day of the trial in this case, the court expressed that it was admitting certain documents, including the notice of default, on the ground that Gina Johnson, an employee of Ocwen, the current servicer of the loan, was able to establish the admissibility of business records that predated Ocwen's involvement with the loan. The court has reviewed Ms. Johnson's testimony again in light of Beneficial Maine Inc. v. Carter, 2011 ME 77 ¶¶ 13-14, 25 A.3d 96, and acknowledges that this is a close question. However, Ms. Johnson adequately demonstrated

---

[3] The original assignment was to Wells Fargo, as Trustee "for the Certificateholders of Carrington Mortgage Loan Trust, Series 2006-OPT 1, Asset Backed Pass–through Certificates" at an address in Irvine, California. The confirming assignment was to Wells Fargo as trustee "for the Carrington Mortgage Loan Trust, Series 2006-OPT 1, Asset Backed Pass–Through Certificates, Series 2006-OPT 1" at an address in Jacksonville, Florida. The court does not find that the slight difference in the description of the trust has any legal significance.

3

that the records of the prior servicer had been integrated into Ocwen's records, and the court accepts her testimony that she had been trained in the business practices of the prior servicer, some of whose employees now work for Ocwen. Tr. 35-36, 44. This testimony is at least sufficient to establish that the notice of default was a business record of the prior servicer, and White testified at trial that he received the notice of default on December 4, 2010, which adequately establishes that the notice is admissible and that it was sent in compliance with 14 M.R.S. §6111. See also certified mail receipt attached to Plaintiff's Ex. 6).

White argues that the content of the notice of default did not comply with section 6111(1-A). Although the court agrees that the wording of that notice (Plaintiff's Ex. 6) may not be ideal, all of the required information is contained in the letter. Although the notice was sent on behalf of American Home Mortgage Servicing Inc. and White testified that he did not know who that was, the evidence demonstrated that he had previously received communications from American Home Mortgage Servicing Inc. in connection with this mortgage. White was also represented by counsel at the time he received the November 17, 2010 notice of default, and it would elevate form over substance to find that, where the required information is contained in that notice, the notice was not sufficiently clear.

5.    Fact of Default and Amount Owed

The court concludes that the payment history (Plaintiff's Ex. 10) and the amounts owed as set forth in Plaintiff's Exhibit 7 are not admissible because Ms. Johnson cannot provide a sufficient foundation to testify that those exhibits, which include information predating Ocwen's involvement as servicer of the mortgage, is a business record. The court finds that when Ocwen purchased Homeward Residential, it obtained Homeward Residential's records and incorporated those in Ocwen's own records and that Ocwen performed various quality control checks to make

4

sure those records had been correctly incorporated. However, that is not adequate to establish that the Homeward records were made at or near the time in question by a person with knowledge.[4]

However, White admitted that he stopped making payments on the note in September 2007 and that he received the notice of default – which is sufficient to establish that White is in default and that plaintiff was entitled to accelerate the debt. Even if Plaintiff's Exhibits 7 and 10 are not admissible, the court would probably be able to calculate an amount of indebtedness from standard amortization tables while disregarding any amounts that are not contained in the evidence. Given the court's ruling on the issue of unconscionability, however, it does not need to reach that issue.

6.    The Circumstances of White's 2005 Refinancing

From White's testimony at the hearing, the court finds that White lives in the mortgaged premises, 134 Lewiston Road in Gray, which he built in approximately 1990. White attended high school, but left in his senior year without graduating and never obtained a GED. He is 56 years old and has held a number of jobs, primarily in construction, during his career.

White has been self-employed since approximately 1993 and has also engaged in intermittent work for a company owned by a friend. As of 2005 he owned 134 Lewiston Road and owed approximately $114,000 to EMC Mortgage Company. His monthly mortgage payment was approximately $1,100.

---

[4] The difference between the payment history and debt figures (Plaintiff's Ex. 7 and 10) and the notice of default previously discussed is that the notice of debt is evidence of what was communicated, and Plaintiff has otherwise established that the notice of debt was received by White. However, the information in Exhibits 7 and 10 is being offered for the truth of the contents, and the court reads Beneficial Maine Inc. v. Carter as requiring evidence as to how the records were created before those exhibits can be admitted.

5

In the fall of 2005 White received an unsolicited call from a mortgage broker who told him that it appeared that White had a lot of equity in his home and that if White refinanced he could "put some cash in [his] pocket." The documents in evidence indicate that the mortgage broker worked for a company called CTC Mortgage which had an office in Raymond. White originally told the broker he was not interested, but the broker continued to call.

Around that same time, White had an accident at work that required forearm surgery, and he went out on workers compensation. Sometime after that, when the mortgage broker called again, White indicated that he might be open to a refinancing, but told the broker the he did not think he could be approved because he had been injured and was receiving $322.07 per week in workers compensation. The broker said that would not be a problem – that the broker could get mortgage financing for anyone.

White had a second surgery on his arm in mid-October. Although White remained out of work and thought it would be 2-3 months before he would resume work, the mortgage broker told White that White could nevertheless get a refinanced mortgage. White was told he would receive $75,000 in cash and that although the monthly payment on his new mortgage would go up, he would be able to pay off his truck loan and that, having eliminated the monthly payments on the truck loan, his new monthly mortgage payment would be essentially equivalent to what he had previously been paying for his mortgage and truck payments.

White was also told that although the mortgage payment on his new mortgage would be scheduled to rise in two years, the mortgage broker would be able to do a second refinancing at a lower rate after six months had passed if White was no longer on workers compensation. Tr. 222. White then decided to proceed with the refinancing.

When White came to sign the papers at the mortgage broker's office, he was told that his new mortgage was with Option One. During the time period when he was discussing the mortgage loan with the broker, White had received various medications following his surgeries, including oxycontin or oxycodone at certain times.[5] White was driven to the closing because of his broken forearm. The court finds that White understood the transaction and was capable of making decisions, but his post-surgery condition and the medications he was taking likely affected his judgment to some extent.

On November 17, 2005, White signed the note and mortgage. On that date and on two prior dates White had signed various documents in connection with the refinancing transaction, including various disclosure forms. Many of those forms are undated but some appear to have been provided to White on October 20, 2005 (e.g., Defendant's Ex. 2) and others on November 17, 2005 – the date of the closing. E.g., Defendant's Ex. 23.[6]

One of the documents White signed on November 17, 2005 was a Uniform Residential Home Application, which listed his monthly income as $6,600. Plaintiff's Exhibit 16. At the time his monthly income (even if he had not been on workers compensation) would have been closer to $2,500. White signed that document without reading it on the day of the closing. He had never told the mortgage broker or anyone else that he had a monthly income of $6,600.

On the same date that he signed the note and mortgage, White also signed a disclosure form (Defendant's Exhibit 16) that stated he understood that he was paying a higher interest rate and that in exchange for that higher rate his broker would receive $1,028.00 from the mortgage company and that certain refinancing fees would not be charged to White.

---

[5] The court did not admit the medical records offered by White in evidence but those were used to refresh White's recollection as to his medical condition and the medications he was prescribed.

[6] At least one document, Defendant's Ex. 15, is dated November 16, 2005.

7

It appears that White had originally received and signed a Truth in Lending Disclosure Statement dated October 20, 2005 reflecting an "amount financed" of $ 175,010 at 8.938 percent. Defendant's Ex. 10. This appears to have been a fixed rate mortgage (the variable rate box was not checked) showing monthly payments of $ 1400.33. By the time White went to the closing on November 17, the "amount financed" had been increased to $ 194,423 and the payment terms had been changed to a variable interest rate (initial rate 9.55%, rising to 12.55% in two years). Defendant's Ex. 23.[7]

After he signed the note and mortgage,[8] White received a total of $48,183.37 in cash – the amount left over after the payoff of his truck loan and a credit card debt. Defense Ex. 22. The truck loan and credit card debt came to a total of $ 28,588.09.[9] Whereas he had previously been paying $1,100 per month plus a truck payment, his new note called for monthly payments of $1,736 and he no longer had to make truck payments. White testified that his monthly mortgage payment was a little higher after the refinancing than the combination of his previous mortgage payment and his truck payment, but it roughly evened out. Tr. 204. However, two years later, on January 1, 2008, the mortgage note payments were scheduled to rise to approximately $2,200.00 per month.

White admitted that after initially resisting, he had decided he wanted to do the refinancing, that he never afterwards changed his mind, that he agreed to the new interest rate on the note, and that he signed documents explaining how that interest rate would work. Tr. 243-45, 248-49. He testified that he knew the amount of money he would receive in the refinancing and

---

[7] Comparing the total payment figure in Defendant's Ex. 10 with Defendant's Ex. 23, the change in terms meant that White would pay more than $275,000 more over the life of the loan.

[8] The mortgage indicates that White signed in front of a notary, but White testified that the document was notarized in his absence.

[9] Adding that figure to the $ 48,183 that White received in cash meant that White received $ 76,771.46 in the refinancing.

what his new monthly payment would be. He also signed settlement statements disclosing that the total fees paid to the broker exceeded $8,000. White testified that he did not read most or all of the documents – and that he has difficulty with reading.[10] However, he signed the documents and went ahead with the transaction even though he was out of work at the time.

At that point, White expected he would be back working by the end of the year. In fact, the injury to his hand and forearm did not allow White to return to work at that time. The injury required a total of five surgeries, including a bone graft, over the next several years. White had been told by the insurance broker that he could refinance again to lower his interest rate after six months or so, but when White called the broker six months later, the broker said he could not help because White was still on workers compensation.[11]

White testified that he knew what his monthly payment would be and that he thought he could have handled it if he had gotten back to work. Tr. 252. At the time of the closing White and the mortgage broker had both anticipated that White would be back to work in approximately three months. Tr. 257-58.

In September 2007 – when White's monthly payment was still $1,736 and four months before it was scheduled to rise to $2,200 – White ceased making any payments and has made no payments since.

Anthony Armstrong, a witness with experience in mortgage brokerage and mortgage transactions, was called by White to offer expert testimony that the refinanced mortgage loan should not have been, given White's status on workers compensation and his actual income at the time of the refinancing. Armstrong also testified that this transaction had the attributes of

---

[10] The court credits White's testimony that he did not read most or all of the documents but does not find that, if he had attempted to do so, White would have been unable to read the documents or to ask questions about anything he did not understand.

[11] White called again in 2007, but the number had been disconnected.

9

what Armstrong termed a predatory mortgage loan – which Armstrong defined as a subprime loan initiated by a mortgage broker containing terms and conditions adverse to the borrower. In this connection Armstrong noted the aggressive tactics of the broker (calling White back after White had initially said he was not interested, visiting White at White's home to obtain the mortgage application) and certain red flags in the transaction, including: (1) an adjustable rate loan with what Armstrong described as a "teaser" rate set initially at a somewhat lower level, followed by upward adjustments to a higher subprime interest rate,[12] (2) the use of a yield spread premium whereby, in exchange for a higher interest rate, certain of the mortgage broker's fees would be paid by the lender,[13] and (3) the amount (approximately $ 8,000) realized by the mortgage broker in the transaction.

White argues that given the predatory features of the refinancing transaction, Wells Fargo should not be entitled to a judgment of foreclosure. There are certainly predatory features of this transaction but White has not cited any Maine law for the proposition that a contract may be voided merely because certain aspects can be described as "predatory." For the court to decline to enforce Wells Fargo's mortgage, the court would have to find that the transaction was unconscionable or contrary to Maine law.

Unconscionability is usually considered in the context of contracts of adhesion, and the refinancing transaction here does not qualify as a contract of adhesion because the important terms (interest rate, variable vs. fixed, amount financed) were negotiable – even if White did not

---

[12] The note (Plaintiff's Ex. 1) provides for an initial interest rate of 9.55% which was subject to change on December 1, 2007 to an interest rate 7.95 percentage points higher than the 6 month LIBOR rate but not to a rate greater than 12.55%. If the interest rate remained below the LIBOR rate plus 7.95%, the rate could continue to change every six months but could not go above 15.55%. Theoretically the rate could also go down to match the LIBOR rate plus 7.95% but the rate could not go below 9.55%. The court can take judicial notice that under this rate structure, the interest rate on White's note would have risen to 12.55% on December 1, 2007.

[13] See Defendant's Ex. 16 (form signed by White agreeing to pay higher interest rate with certain broker's fees to be paid by lender).

10

negotiate them and agreed to unfavorable terms. Nevertheless contract terms that are extraordinarily oppressive and that are obtained by overreaching and other improper tactics may be found to be unconscionable if enforcement of the contract would shock the conscience. Leeber v. Deltona Corp., 546 A.2d 452, 454 (Me. 1988); Restatement (Second) Contracts § 208.

There are factors that could weigh against a finding of unconscionability in this case: (1) White had the choice to proceed with the transaction and ultimately decided he wanted to proceed; (2) he chose not to read most or all of the documents; (3) he knew the monthly payments would be roughly equal to his old mortgage payments and his truck payment; (4) he knew his payments would increase in December 2007; (5) he acknowledged that the mortgage broker's statements about refinancing in the future were based on White's ability to resume working (which White expected to be able to do), see Tr. 222; and (6) White defaulted before the increase in monthly payments took effect. Where required disclosures are set forth in the documents, a party should not be able to benefit by deciding not to read the documents.[14]

Weighing in favor of a finding of unconscionability, however, are the extremely unfavorable terms of the refinancing transaction, particularly when compared to the fixed rate loan that was previously discussed in Defendant's Ex. 10. Other factors supporting unconscionability are (1) that White was subjected to high pressure sales tactics by the mortgage broker; (2) that White was in a vulnerable condition because he was recovering from several surgeries; (3) that some of the adverse terms appear to have been added at the last minute, when

[14] The court cannot find that the refinanced mortgage loan resulted from fraudulent misrepresentations made to White if the appropriate disclosures were made in documents White chose not to read. Moreover, the alleged misrepresentation that White could refinance again after approximately six months was expressly based on the assumption (shared by White and the mortgage broker) that White would be back at work at that time. Tr. 222. The fact that White's injury unexpectedly was far more serious and long-lasting does not constitute a basis for a fraudulent misrepresentation claim.

It bears emphasis that to the extent that White might have a claim for rescission under the circumstances of this case, he has not sought rescission, and a remedy of rescission would require White to give back the amounts he received in the refinancing transaction.

11

White had already decided to proceed with the refinancing and it would have been hard for him to change his mind; and (4) that many of the required disclosures were only made on the date of the closing – again, at a point when White had already decided to proceed with the refinancing. By that time the mortgage broker would have been aware that White was signing documents without reading them.

There were a number of other questionable aspects of refinancing transaction, including the fact that White's loan application was not even signed until the date of the closing. Evidence of the overreaching that characterized this transaction is that the mortgage broker, who later took the position that White's status on workers compensation disqualified White from obtaining a new and more favorable mortgage after the 2005 refinancing, was more than willing to disregard that status and misrepresent White's income in order to proceed with the 2005 refinancing and saddle White with a high fee, high rate subprime mortgage loan that should not have been made.

In fact, the most important factor from the court's point of view is that the mortgage broker misrepresented White's income on the loan application. Plaintiff's Ex. 16. White signed but did not read that document and was not responsible for the misrepresentation.[15] If White's true income had been reported, he would not have qualified for the refinancing. The oppressive terms of the contract, the improper tactics of the mortgage broker, and the material misrepresentation of White's income establish that under the unique circumstances of this case, the refinancing transaction was unconscionable.

In reaching this conclusion, the court finds support in former section 9-A M.R.S. § 8-206-A(12). That section, which was repealed effective January 1, 2008 but was in effect at the time of the refinancing transaction, provided as follows:

---

[15] This misrepresentation cannot form the basis for a fraudulent inducement claim because the misrepresentation was not made to White and White did not rely on the misrepresentation. See Restatement (Second) Contracts § 163.

12

> A creditor may not engage in a pattern or practice of extending credit to a consumer under a high-rate, high fee mortgage based on the consumer's collateral without regard to the consumer's repayment ability, including the consumer's current and expected income, current obligations and employment.

Based on the evidentiary record in this case, the refinancing transaction resulted in the extension of credit to White under a high-rate, high fee mortgage without regard to White's repayment ability.

No admissible evidence was offered as to a pattern and practice. White offered hearsay and inadmissible character evidence challenging the practices of Option One, but the court cannot rely on such evidence. M.R.Evid. 404(a).[16] However, even if not directly applicable, former section 8-206-A(12) is important as a statement of public policy that supports a finding of unconscionability under the circumstances of this case. Moreover, at least by the time the mortgage was assigned to Wells Fargo on January 15, 2008 (see Plaintiff's Ex. 3), the applicable statutes provided that an assignee such as Wells Fargo was subject to any claims or defense that could have been asserted against the original creditor. 9-A M.R.S. § 8-209(4)(A) (2007).[17] White's defense of unconscionability can thus be raised as against Wells Fargo.

The finding that certain aspects of the refinancing were unconscionable does not mean that the entire transaction should be invalidated. For one thing, based on the findings above, White was aware of the material terms of the transaction and chose to go ahead because he wanted the money he would receive on the refinancing. He cannot evade his portion of the responsibility for the transaction. For another thing, the court is reluctant to conclude that White,

---

[16] There are some indications that White's transaction was not an isolated instance – including the fact that White was "cold called" by the mortgage broker, and that the broker, when he was informed that White was on workers compensation, responded that he could get a mortgage for anyone.

[17] In this case both the mortgage broker and Option One would qualify as a creditor. 9-A M.R.S. § 1-301(17) (2007) (including within the definition of creditor any person who originates 2 or more high rate, high fee mortgages in a 12 month period).

13

who has made no mortgage payments whatsoever since 2007 and is effectively living in his residence rent-free, is entitled to a "free house" under the circumstances of this case.

Under section 208 of the Restatement (Second) of Contracts, a court can refuse to enforce unconscionable terms without invalidating the entire contract and may limit the application of unconscionable terms to avoid an unconscionable result. In this case the refinancing provided White with funds to retire his previous mortgage, pay off his truck loan, and extinguish a credit card debt that had been reduced to judgment. Defendant's Ex. 22. White would have had to pay those obligations, which totaled $ 142,558.45, if he had never refinanced. Stripping all of the unconscionable aspects of the refinancing transaction, therefore, White would at least have had to pay an amount equaling his prior obligations. If the $ 1,736 White paid monthly from January 1, 2006 through August 1, 2007 is credited against that amount, the remaining obligation that White would have had to pay would have been approximately $ 110,000.

This leads the court to conclude that Wells Fargo is entitled to a judgment of foreclosure but for only $ 110,000.00 – which on this record represents what White would have had to repay if he had not refinanced.[18] A different result might be called for if there were evidence that White would not have gone into foreclosure if he had kept his prior mortgage and truck loan. In this case, however, White had testified that his prior mortgage and truck payments were roughly equivalent to his new initial monthly mortgage payments, and he stopped making those payments because he "ran out of money." Tr. 263. The court therefore finds that it is more than likely that White would also have defaulted on his prior obligations and that Wells Fargo is therefore entitled to a judgment of foreclosure based on indebtedness of $ 110,000.

---

[18] The court understands that this is not an exact figure because the payments made by White on his original mortgage and truck loan would have included interest and would not necessarily have reduced his obligation on a dollar by dollar basis. However, neither party chose to offer evidence as to the terms of White's EMC mortgage or his truck loan and the court therefore has reached the $110,000 figure based on the evidence before it.

14

The only remaining issue involves attorneys fees and costs. Under the provisions of the note and mortgage and 14 M.R.S. § 6101 Wells Fargo is potentially entitled to its attorneys fees to the extent that it prevailed in this action. 14 M.R.S. § 6101 also provides that if a mortgagee does not prevail or if the action is not brought in good faith, the mortgagor may be entitled to attorneys fees and costs and that the court may then deny attorneys fees to the mortgagee. Given the lengthy proceedings in this case, an award of attorneys fees to either party would involve a relatively significant sum.

The court does not find that Wells Fargo – which did not itself engage in any improper or questionable tactics in connection with the refinancing transaction and came into the transaction as an assignee – brought this action in bad faith. Moreover, both parties prevailed in part and did not prevail in other respects. Accordingly, no attorneys fees or costs shall be awarded.


The entry shall be:

For the reasons stated in this order, Wells Fargo is entitled to a judgment of foreclosure based on indebtedness of $ 110,000. Plaintiff shall submit a proposed judgment consistent with this order. The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: March __21__, 2014

Thomas D. Warren
Justice, Superior Court

15

Portland, ME 04101

PORTFOLIO RECOVERY ASSOCIATES LLC *Party in Interest*
c/o EDWIN DAGGETT ESQ
PO BOX 10189
PORTLAND, ME 04112

CLERK OF COURTS
Cumberland County
205 Newbury Street, Ground Floor
Portland, ME 04101

WILLIAM B JORDAN ESQ *Plaintiff Attorney*
SHAPIRO & MORLEY LLC
707 SABLE OAKS DRIVE SUITE 250
SOUTH PORTLAND, ME 04106

CLERK OF COURTS
Cumberland County
205 Newbury Street, Ground Floor
Portland, ME 04101

JOHN S CAMPBELL ESQ *Defense Attorney*
CAMPBELL & ASSOCIATES
59 BAXTER BOULEVARD
PORTLAND, ME 04101

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
RE-11-77
*CUM-TDW-D7-08-14*

WELLS FARGO BANK, N.A.,
As Trustee,

Plaintiff

v.

ORDER

BRADFORD WHITE, et al.,

STATE OF MAINE
Cumberland. ss. Clerk's Office

JUL 08 2014

RECEIVED

Defendant

In light of the Law Court's recent decision in <u>Bank of America v. Greenleaf</u>, 2014 ME 89, the court will withdraw its order denying defendant's motion for reconsideration and will vacate the judgment entered on June 23, 2014.

White's motion for reconsideration will remain under advisement until the time period for a motion under M.R.App.P. 14(b)(1) for reconsideration by the Law Court of the <u>Greenleaf</u> decision has expired. If such a motion is filed, White's motion for reconsideration in this case will remain under advisement until the Law Court mandate issues in <u>Greenleaf</u>.

The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: July _8_ , 2014

Thomas D. Warren
Justice, Superior Court

CLERK OF COURTS
Cumberland County
205 Newbury Street, Ground Floor
Portland, ME 04101

JOHN CAMPBELL ESQ
CAMPBELL & ASSOCIATES
59 BAXTER BOULEVARD
PORTLAND ME 04101

Defendant's Attorney

CLERK OF COURTS
Cumberland County
205 Newbury Street, Ground Floor
Portland, ME 04101

WILLIAM JORDAN ESQ
SHAPIRO & MORLEY LLC
707 SABLE OAKS DRIVE SUITE 250
SOUTH PORTLAND ME 04106

Plaintiff's Attorney

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
Docket No. RE-11-77
TDW-CUM-√12/13/2012

WELLS FARGO BANK N.A.,
as Trustee for Carrington Mortgage
Loan Trust, Series 2006-OPT1, Asset
Backed Pass Through Certificates,
Series 2006-OPT1,

        Plaintiff

v.

BRADFORD WHITE,

        Defendant

ORDER

STATE OF MAINE
Cumberland, ss. Clerk's Office

DEC 18 2012

RECEIVED

This is an action brought by plaintiff Wells Fargo Bank seeking to foreclose a mortgage securing a loan to defendant Bradford White. Before the court is Wells Fargo's motion for summary judgment.

Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. In considering a motion for summary judgment, the court is required to consider only the portions of the record referred to and the material facts set forth in the parties' Rule 56(h) statements. E.g., Johnson v. McNeil, 2002 ME 99 ¶ 8, 800 A.2d 702, 704. The facts must be considered in the light most favorable to the non-moving party. Id. Thus, for purposes of summary judgment, any factual disputes must be resolved against the movant. Nevertheless, when the facts offered by a party in opposition to summary judgment would not, if offered at trial, be sufficient to withstand a motion for judgment as a matter of law, summary judgment should be granted. Rodrigue v. Rodrigue, 1997 ME 99 ¶ 8, 694 A.2d 924, 926.

The Law Court has suggested in a series of recent cases that the summary judgment standards must be scrupulously followed in mortgage foreclosure cases. Applying those standards in this case, Wells Fargo has not adequately established that it is entitled to summary judgment. This is true for several reasons, including but not necessarily limited to the following:

1. The moving affidavit in this case is submitted by Tonya Hopkins, an employee of the servicer of the loan. While summary judgment may be based upon the affidavit of a servicer where appropriate, it is unclear the extent to which the motion is relying on business records as to which Ms. Hopkins can provide an adequate foundation. The court accepts that Ms. Hopkins has established that the records of Homeward Residential Inc. (formerly American Home Mortgage Servicing Inc.) are business records but her affidavit (¶ 4) suggests that she may also be relying on business records of prior holders of the note and/or prior servicers. To the extent this is true, she has not established that it was the regular practice of the prior entities to make such records or that those records were made at or near the time of the events recorded by a person with knowledge.[1]

2. Ms. Hopkins asserts (¶ 7) that Wells Fargo "is the holder of the note or is otherwise entitled to enforce it." (emphasis added). This leaves open the possibility that Wells Fargo is not the holder. If Wells Fargo is not the holder, the court has not been

---

[1] The court is not necessarily holding that plaintiff needs to establish that the note and mortgage themselves are business records. However, the default in this case is alleged to have occurred in October 2007, and the first assignment of mortgage is dated June 2008. It therefore appears that Wells Fargo is relying on business records of Option One/Sand Canyon to establish the date of the default and the amounts due prior to the assignment to Wells Fargo.

2

presented with any facts that would support Ms. Hopkins's legal conclusion that Wells Fargo is otherwise entitled to enforce the note.[2]

Those issues are sufficient to require that summary judgment be denied. As a result the court does not have to reach the following issues at this time:

1. Whether, since the corrective assignment of the mortgage is signed by an officer of "Sand Canyon Corporation f/k/a Option One Mortgage Corporation," Wells Fargo would have to make an additional factual showing that Option One became Sand Canyon prior to the corrective assignment.

2. Whether Wells Fargo has made a sufficient showing that White received the notice of default. Specifically, there is no showing that White signed a certified mail receipt, 14 M.R.S. § 6111(3)(A), and Wells Fargo has not submitted a certificate of mailing to establish proof of receipt by ordinary mail. 14 M.R.S. § 6111(3)(B). It is possible that in the case of certified mail, the "track and confirm" email from the Postal Service might be admissible as either a business or public record but the document submitted by Wells Fargo does not show that a return receipt was requested.

3. Whether Wells Fargo has made a sufficient showing as to the amount due. In this respect the business records upon which Wells Fargo relies are less than clear. In particular, the court cannot understand how Wells Fargo has calculated an accrued interest figure of $99,734.61 as of June 2012.

4. Whether White has raised a genuine issue for trial as to whether there were any Truth in Lending violations in this case or whether the loan transaction in this case would qualify as unconscionable. In this connection, the court recognizes that some of the facts offered by White on this issue in his affidavit are not supported by his

---

[2] The copy of the note that is annexed to Ms. Hopkins's affidavit is endorsed in blank. Under those circumstances, as far as the court is aware, Wells Fargo can only enforce the note if Wells Fargo is in fact the current holder of the note.

3

deposition testimony but does not need to rule on whether White's remaining factual assertions would be sufficient to defeat summary judgment.

Not included in the above list are certain factual issues sought to be raised by counsel for White based on documents obtained from various sources on the internet. Factual assertions and allegations drawn from the internet do not constitute evidence that "would be admissible in evidence" under Rule 56(e) and those would not preclude summary judgment.

Finally, the court notes that plaintiff's summary judgment motion refers to an answer and affidavit submitted by party in interest Portfolio Recovery Associates LLC. See plaintiff's statement of material facts ¶ 14. Neither that answer nor the affidavit is contained in the court file. It therefore appears as if Portfolio Recovery Associates served papers upon plaintiff's counsel but neglected to file them with the court.

The entry shall be:

Plaintiff's motion for summary judgment is denied. The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: December 17, 2012

Thomas D. Warren
Justice, Superior Court

4

12/13/2012

MATTHEW C GEOFFROY VS JESSICA M POWERS

UTN:AOCSsr  -2012-0042182                 CASE #:PORSC-CV-2012-00218
--------------------------------------------------------------------------

MATTHEW  C. GEOFFROY                                      PL

SHERMAN, DAVID  Tel# (207) 772-1941

84 MARGINAL WAY SUITE 600 PORTLAND ME 04101-2480


JESSICA  M. POWERS                                       DEF

ATTY CHURCHILL, SARAH A.   Tel# (207) 283-6400

ATTY ADDR:110 MAIN ST., SUITE 1520 SACO ME 04072